Macaulay, MN Appellant, Chef Bruce Millsian, and he is here at the desk. Our case is a post-license termination trademark infringement case, and key importance in this case is this court's decision in Professional Golfers Association versus Banker's Life. As you may remember in that case, Banker's Life kept using PGA to describe their golf courses after their license to do that had terminated, and this court said, we can't do that. That case has been cited in every circuit in the United States. It's been followed by the 2nd, 3rd, and 11th circuits at least in similar facts. The consensus of the courts in that case is that once your license terminates as a trademark licensee, you can't keep using the mark. And there's similar reasoning, and the reason, of course, is that the public thinks they've already associated the trademark with the owner of the trademark, and if the trademark licensee keeps using it, then they think the trademark owner must have said that's okay. That's approval. And there's similar reasoning in Pebble Beach versus Tour 18, where Tour 18 was copying different golf courses, certain, you know, certain, I guess, holes, golf holes. And the public thought that surely the golf courses had given permission for that, and this court said permission is tantamount to approval, so again, they can't do that. The Supreme Court last year in Jack Daniels versus VIP Products said that the Lanham Act views trademarks as source identifiers, and so if someone is even using a trademark as a source in part, that's trying to trade off the trademark owner's goodwill, and they should then plan to defend themselves for likelihood of confusion. In this case, the defendant, Apple East, have been very reluctant to admit they've used the mark, and their website for the restaurants, Bellagreen Restaurants, for over five years has said, let's see, I want to read it so I won't say it wrong, something along the lines of, since 2008, we have been offering our guests amazing food, I believe is the word, at reasonable prices. Our name has changed, but our food has maintained its high quality. So there's a lot of pronouns in there, and our, since 2008, Bellagreen actually wasn't even on the scene until nearly a decade later. 2008 was the first Ruggles Green restaurant, Chef Mulsanne's first restaurant as Ruggles Green. So right there, they've associated with him. And then it's our food. We've changed our name. The food is amazing, the same high quality. Those things all associate with Chef Mulsanne. So clearly, in my opinion, they were trading off of his goodwill. Okay, but they had a license to use Ruggles Green at one point, and they operated restaurants under that name, didn't they? Yes, Your Honor. They did have a license to use Ruggles Green. In that sense, they did change the name after they lost their license. They did change their name even before they lost their license, that's right. So isn't that legitimate to say that? We've changed their name, and I think you gave them permission to use the menu, didn't you? Well, they had in the settlement agreement to get the case to just end the settlement agreement, Chef Mulsanne said, you can keep using my recipes as long as there's no association with me. And that was the deal there. In other words, you read that to mean they couldn't use it after they lost their license? They couldn't use the name Ruggles Green. That was in the settlement agreement also. They had 30 days. The menus either or the recipes. Well, they could use the recipes as long as they didn't associate them with Chef Mulsanne. But if there was any association that the recipes were from Chef Mulsanne or the food was his food or the same kind of food, that kind of thing, then that was not allowed. And it's true that Bella Green thinks, well, they even say on the Visit Houston website, which they have listings, they're paid listings, and those listings connect directly to their own website, Bella Green website. They say rebranded from the former Ruggles Green. They've said that even to the least of the last week, they were still saying that. Well, it's very difficult to have a Ruggles Green restaurant and a former Ruggles Green restaurant in the same marketplace. Because consumers think, well, the Ruggles Green must be an old ad for Ruggles Green because clearly it's former Ruggles Green now. So all the advertising you do for Ruggles Green will go to Bella Green. Didn't a search under the Houston, First Houston website, a search for Ruggles Green turn up a reference to Bella Green? Yes, Your Honor, it does. And Ruggles also. And we say in our complaint that the Visit Houston people advised me that that could only happen at the direction of Bella Green. They would never do that on their own. They would never link Ruggles and Bella Green together. Didn't you have a similar situation with a Google search also? Yes, Your Honor. Well, with Google, when you search for Ruggles, now it's even getting so sometimes it's Ruggles Black. With Ruggles Green, it comes up Bella Green. In fact, the information pages for Bella Green would show up on the Ruggles Green. But when you search for Bella Green, you didn't get an information page for Bella Green. You know, the information panels that have all the information. So it's very confusing. And it's caused a conflation of the restaurants on the Internet. And I think new people now don't even know there is a difference. And some people even ask Chef Molzan to this day about it, and they're surprised he's still open. Some people think they can't even get Ruggles anymore. I mean, this is a mark he's used for 40 years. He's been developing Ruggles. He's had a number of Ruggles restaurants. Could you respond to, I think, a point the district court made that the allegations failed to connect Bella Green with these problems on the Internet? That, well, maybe that's a problem with Google, or that's a problem with the Houston City website, and that your allegations didn't properly connect the defendant to these problems? What is your response to that? It's a good question, yes. And we haven't relied totally on the Internet confusion, because I don't know how they do that, honestly. You know, there are hard things we found. We did find a Ruggles Green subdomain on the Bella Green website. And we did use, we got the, well, we learned that could only happen if they had control of Ruggles Green. Well, they weren't supposed to have control of Ruggles Green domain, and they did not legally, as far as anyone could determine, have Bella Green on the ownership. We inadvertently lost that on the same day it was picked up. And so we know there was a connection, but I can't prove it's Bella Green. But the ICANN panel did say that they thought that showed that that was evidence that the Ruggles Green domain had been used unfairly and in bad faith, and they returned it to Chef Molson. So they believed that there was a connection in the Ruggles Green subdomain on the Bella Green restaurant website. But I don't have any proof of that. I don't know that. I just don't believe it. You've alleged all that. Yes, Your Honor. And you would have to prove it if you were able to go forward. But this case was dismissed on the pleadings, right? Yes, Your Honor. Okay. But didn't you allege, though, that both the Houston website personnel and the Google representative told you that the only reason the reference to Bella Green would have been if they authorized it? That is what the Visit Houston people said, Your Honor. And that is the impression I have from Google. But Google doesn't communicate much with you about what's going on there. You just mostly have to read what their rules say and how things are controlled. Do you have anything else for us? Oh, yes, Your Honor. Okay. So I wanted to, I guess I was pointing out, I meant to mention the Board of Supervisors versus MAC apparel case, because that was back on the pronouns I was talking about. That's what happened there. And I wanted to point out that that supports us there, that that still connects to Bella Green. And we just talked about the list of Visiting Houston. Bella Green cites Playboy Enterprises and Burris Mill, Playboy Enterprises versus Wells, and Burris Mill Elevator Company versus Wills and Scott Fetzner Company versus House of Vacuums as their justification for being able to say on the Visit Houston website that they are rebranded from former Ruggles Green. And we disagree with their interpretation of those cases. And the reason is the Playboy Enterprises case and the Burris Mill case are about individuals trying to use the trademark to refer to some work experience they had, like Playmate of the Year. But she wasn't trying to say she was Playmate Enterprises. And similar, Burris Mill, the guy was doing a, had been in a band that promoted a business, a flour mill, and he wanted to say he'd been a light crust dough boy, I believe it was. But that's different. We're not talking about Bella Green trying to say they work for Ruggles Green or something like that, or one of the waiters there, I mean, or a chef there or something like that. They're trying to basically say they are Ruggles Green. Everything's the same but the name. And even in the Burris Mill case that they cite, the Texas Supreme Court said if you're trying to use the mark to indicate you are the former business, then that's not allowed. And so I don't think those cases actually support them. The Scott Fetzner case versus House of Vacuums, their House of Vacuums actually sold a product that Scott Fetzner made. So this is totally different too. Bella Green doesn't sell food that Chef Moulson makes. So I think that's very different. Yeah. Explain to me the allegation that you had about the Ruggles Green showing up on a search of one of the Bella Green defendants' own websites turned up Bella Green. I guess it was the Hargett Hunter's website. Let's see. Yeah, Hargett Hunter is the investment bank that bought some restaurants that had license to use Ruggles Green. They weren't the defendants, right? Yes, Your Honor, they are. And they had on their website that they bought the Bella Green, the Ruggles Green restaurants. But they didn't. They bought restaurants that had the license to use Ruggles Green. And they'll tell you, well, Chef Moulson owned those, but he only owned about a third of the first one. He did not own any of the others. He owned a company. He had an interest, again, a third share roughly interest in the management company for the others that just made sure they used the mark right. But he only licensed the mark. They didn't buy the Ruggles Green mark. So they didn't really buy the Ruggles Green restaurants in our view. That would be like if you bought a restaurant that had been in McDonald's and they lost their McDonald's license, they can't go in now and say it's formerly McDonald's. It's really the same kind of thing. All right, Counsel. I think we have your argument. Thank you. Thank you. May it please the Court. My name is Colin Rose, and I represent the Apleys in this case, of which there are a few. So we've collectively referred to them as either the Bellagreen defendants or Apleys and the Webb defendants. Pull that mic up, please. Oh, sorry. I may need to stoop down some. I'm here with my colleague, Roderick Hatch, as well. So the Apleys are requesting that this Court affirm the lower court's dismissal of all of the claims against the amended complaint as well as the refusal of leave to amend to file a second amended complaint. Appellant is under the burden in this case to present a claim that's plausible on its face. To do so, what they've done is package a lot of different activities together as well as make conclusory allegations and present them under a theory of where there's smoke, there's fire. So there must be some sort of infringement or some sort of liability. Let me ask you this. Now, on the Houston website, if you made a search for Ruggles, you got a Belmont restaurant, and they allege that the Houston manager of the website said that that wouldn't have been on there unless it had been authorized by Bellagreen. Well, why isn't that a plausible allegation of a franchise violation? Your Honor, just for a quick point, I don't believe that they have alleged or stated that they've spoken with anyone at Visit First Houston. They said they were informed or on information and belief. Yeah, I think it was information and belief and information provided on the website. So I just want to make clear that I don't believe that they have said that they've talked with anybody. The short answer to that is we do not know. We're not familiar with the Visit Houston First website. We've never contacted them. We have no idea how the listings are. Wouldn't that be a question of fact then? If it survived the requirements with respect to pleading a cause of action that's plausible on its face, then yes, eventually, Your Honor, it would be a question of fact. Unfortunately, in the complaint itself, and even after the opportunity that they took to try and file yet a third complaint, they have not alleged that we actually had any sort of editorial control over those listings, that we were even responsible at all for the listings. They just said that they merely existed without tying them to us at all. If under, for example, First Houston's rules of operation, it would allow an inference that Bella Green had to authorize it or they wouldn't have put it on there, why wouldn't that raise the question of fact? Your Honor, with respect, I don't believe that it would be a reasonable inference that they could draw, that it's merely an accusation that is conclusory on its face. It is our position that it would not be enough to survive the standard of presenting a plausible claim. And there's allegations of a number of Google searches that essentially found the same thing. If you do a search for Ruggles, you get a link that links you to a phone call, and you call the number, and it's answered by Bella Green. And they allege on information and belief that under Google's rules, that wouldn't happen unless Bella Green authorized it. Yes, Your Honor. How could a phone number like that be a link unless somebody provided it? Correct. And I think the important thing to note here is the historical perspective of the relationship of the parties. As my colleague mentioned before, we were a licensee under the Ruggles name or the Ruggles Green name, I apologize, to operate a restaurant under the name Ruggles Green. I understand. At that time, the business was established, and I believe through legitimate it was already a restaurant, but I believe it was already established with Google or Apple Maps or whichever service you want to refer to as Ruggles Green with a phone number. When we purchased the restaurant and became licensees of the name, the address did not change, the phone number did not change, the name did not change. It continued in existence as Ruggles Green for a period of time even after we purchased it. They allowed you to do it for, what, 30 days? No, no, no. I'm talking before even the license was canceled, before the settlement agreement. We operated the restaurant for, I believe, a period of a year or so before the previous litigation. With that, Google and Apple Maps had established a link of the phone number and any sort of these other knowledge panels that they refer to, and legitimately so, all of those were linked with Ruggles Green. Then when the name was rebranded as Bella Green, that historical affiliation that Google makes and Apple Maps make, et cetera, we would try and update that because obviously we want those, when you do a search for an address or our name, we want the knowledge panel to pull up. But because the address didn't change and the phone number didn't change, even if you did a search for Bella Green, it would pull up, obviously, the old address and the old phone number. How those knowledge panels work and how the information works in terms of what Google presents really is outside of our control. There's nothing that I can go and do right now and call Google and tell them and force them to go and change it. We requested that they make that change. We did not want that relationship to exist ourselves, but there's nothing that we can actually do to force them to make that change. I mean, in the contract, you agreed that you'd do everything you could, basically, to take all that out.  And they even agreed that we had done that. And so why wouldn't you get a question of fact pretty quickly to determine whether you did all you could? Well, if you recall in the language of the settlement agreement, it wasn't even an obligation that we would contact Google and Apple Maps, et cetera. There was a statement in the settlement agreement from 2018 that we already had contacted them and told them to remove those affiliations. So that activity had already been done. It wasn't an ongoing obligation. There was an agreement through the settlement agreement itself that we had already done so. Well, there was something in there about look forward. I don't have the contract in front of me. Yes. You would do all you could. What was that all about? We were not to redirect website traffic between the two names. How do we know that you didn't if it remained on those websites? Well, at this point, Your Honor, it's under appellant's burden in the complaint to present a plausible cause of action that, in fact, that could have happened. So far, they have not. Obviously, clearly, if they had presented enough information or enough claims in their complaint to do so, then eventually, yes, that would be an issue before the court. But in their complaint, the original complaint filed in the case that was under seal, the second cause of action, which is this one that was filed not under seal, in the first amended complaint, so now we're on the third complaint that they filed, they have failed to do so. They've never established that we had done anything nefarious after the settlement agreement that caused any sort of redirection of traffic that was not due to any sort of activities that existed before the settlement agreement. So she mentions the concept of this subdomain, which is a very complicated concept. I had to learn it myself. The subdomain is an account with a website called WordPress. WordPress allows you to write text, insert pictures, et cetera, that then you can refer to when you display your website. When we operated the Ruggles Green restaurant and the Ruggles Green website before the license was terminated, we had control over the Ruggles Green website and this WordPress account. The subdomain is not a subdomain to the Ruggles Green website. It's a subdomain to the WordPress account. But whoever owns the mark controls the subdomain, don't they? Not in this case, Your Honor. It's whoever wanted to open an account with WordPress, it was done so under the name Ruggles Green. It had nothing to do with who owned the trademark. Plus, at that time, we controlled the Ruggles Green domain legitimately anyway under the license. Mainly what I'm hearing, Counsel, that's certainly more true than that, that here on this 12B6, there's a lot that you say will make her allegations not very plausible. Once we are fully aware of how the Internet works and how these associations are made, is it proper to decide all this at the pleading stage? I mean, what you're telling us right now, things you found, had to learn about, well, whatever you were talking about a little while ago, that's not part of the pleadings, and I don't know how we could rule on that. Your Honor, obviously our position is that they have not pleaded their case properly. Well, you're saying this sort of general knowledge makes all of what she said implausible, all of what's in the complaint implausible. Well, I'm not sure that's how it works. It's on the face of the complaint are these allegations about these links and about the inability or the failure so far of the defendants to break these associations. Has she made, has Mr. Mozan made plausible allegations about that? And what I'm hearing about their implausibility is mainly outside the pleadings. Your Honor, forgive me. I didn't mean to create that impression by trying to explain some of the technical aspects. Well, no apology needed. Make an argument. Well, if we break down these activities that they're concerned about, one thing that's a struggle in terms of reviewing the pleadings is getting an idea of what happened before and what happened after the settlement agreement and what was the settlement agreement covering, what should have been fixed under the settlement agreement, et cetera. So I think the main kind of point we would make on that is with respect to trying to decide what was in our control, because if it was not in our control and there was no facts presented that would be plausible that it would be in our control, then obviously there's not going to be any liability on our part and would not be a plausible cause of action. So it's not plausible. Well, if the allegation is made, Ms. Houston, let's just talk about Google. These connections are made, violated, obligations to have them removed. There needs to be an allegation that it is possible that Google does allow these sorts of complaints to be made and changes to be made in how the search will be displayed. Do you think at the pleading stage that needed to be part of the complaint? Your Honor, I don't believe that they've alleged that we have done anything in terms of contacting Google to keep that sort of affiliation. Well, not that allegation. I'm thinking the opposite. You seem to be saying they need to allege in the complaint that it's possible to do that and actually the fact that these associations continue on improperly to appear means they haven't done that. That just seems like more than what a complaint would usually have in it in order for a plausible allegation to be made. Well, it's our position obviously that we feel that there needs to be some at least plausible accusations instead of just conclusory allegations, that there's some sort of responsibility on our part for any sort of website or Google or Visit Houston or whatever that shows some sort of link between them and us. I think the question was asked earlier that there seems to be a question regarding the connection between any of this confusion that may be out there and the actual appellees in this case. I think ultimately that's the problem with respect to any of these third-party websites that are outside of our control is there's no link that's been established between anything that we have done or any control that we would even possibly have over them in the complaint, any of the complaints that have been submitted so far. And so if the complaints had alleged even any information that would have tried to establish that sort of fact, then I don't know that we would be talking here today, but the fact is that the complaints failed in that regard. They did not establish any link of control whatsoever between us. And obviously we don't control Google. We don't work through the Houston First website, et cetera. Let me ask you this. Once you got notice, I know there was some communication between Mr. Moson and the defendant about these websites. If you made the search for Ruggles and you come up with Bellagreen, there were numerous instances of that, and they gave you notice of that. And to avoid infringing, wouldn't you have a duty to go to Google and say, look, I didn't authorize this? I mean, don't you have a duty to avoid infringing someone else's mark to that extent? I mean, apart from what the contract says. Well, I'd like to differentiate. It almost seemed like there may be two questions there, so I want to differentiate. Yes, we have an obligation to not infringe someone's trademark. I'm not saying that we don't. Do we have an ongoing obligation to control what Google puts on their knowledge panels, even though we have nothing? Make effort to call and avoid it, because it seems to me you are infringing on, I mean, it may be that you're infringing if you don't make efforts to correct a situation that you know may be an infringement. Your Honor, the obligation that we had under the settlement agreement, we satisfied. But don't you have an obligation, apart from what was in the settlement agreement, to correct any misinformation that the search engines have that may cause you to infringe? With respect, if it was outside of our control, I'm not sure that we would have that obligation. What's the best case for that? Their best case for that, in which we suggested, and I believe that they did, and started eventually to see some results, as she has commented, or they have commented in their briefs. Well, some results, but they say it's continuous even now. But I think at the end of the day, the admission, even on Appellant's part, is that's a very difficult task to do, because they discuss how they have tried to contact, I'll just use Google, because that's the easiest, but all of these websites, but they have tried to contact Google and tell Google the misinformation or the false connection between the two. And even they met with difficulty in trying to get that connection broken. In other words, even after they contacted Google, just as we did, they still were seeing knowledge panels and some mix-ups in terms of search results, et cetera. Well, I can see, though, if you were doing a trial, they could point out it was to your advantage not to really do all that much effort to correct this, because it was working to your advantage. So it seemed like you'd get to a question of fact pretty quick about whether you did exert enough effort to avoid infringing. Your Honor, if I'm understanding you correctly, and to be honest with you, we haven't briefed this exact question, so I'm not exactly sure that the case law on it, but if I'm understanding the question correctly, is if we've met our obligations under the settlement agreement and all of those claims were released under the settlement agreement. Released up to the date of the settlement agreement. Sure. And then due to no action on our part, Google was still making these mistakes. You had notice of it. And we had notice of it. Were we under some sort of obligation, even though we had not taken any action and, in fact, met our obligations to correct that action? Were we under some sort of eternally continuing obligation to continue to correct Google? And to be honest with you, in terms of case law, since I haven't researched that question, I don't know the answer, but I would have to say off the cuff that I don't know that we did have that obligation. You think you'd have a reasonable obligation or something of that nature? I'm not sure that we would in the sense that Google is a third party. They're not under our control. As long as we are not taking specific actions that would violate, you know, that we weren't doing anything ourselves to create that confusion or whatever relationship in Google, that I'm not sure that we would have some sort of eternally existing obligation. I hope that answers your question. The one other point that I wanted to maybe address as it came up in the opening remarks, and I see that I'm somewhat short on time, is the nature of some of these cases with respect to, and I'll use the PGA case as an example in an attempt to show that we're a little bit different in the sense that the PGA case, the license there was to be able to use the PGA name by the developer to advertise this new development they were putting in. They never had a license to actually operate a golf course or any sort of private country club, etc. Then when the PGA pulled out, the developer decided to rename the golf course and continue with the exact same PGA or Professional Golfers Association mark. They did not change that. They left that in place. That's different than our situation here, whereas even when we were still licensees, we decided to rebrand and change the name completely. Certainly, all of that was captured in the previous settlement agreement as well, but we did not attempt after the litigation to continue calling the restaurant Ruggles Green. It was changed to Bella Green. Therefore, on that grounds, we believe that case can be differentiated. All right, Kelson. Thank you very much. We appreciate it. Your Honor, I do have a few things to say. The mic is in the wrong place again. I'm sorry. I do have a few things to say. All attorneys should be the same height. It doesn't work that way. Mr. Rose referred to history. Everything is history. But the Visit Houston site, he does have responsibility for. That is a paid listing. It links directly to the Bella Green websites. And the Visit Houston information says that that is for paid listings. It's not something they do on their own. Also, it's not that historical. It can't be something they had as a leftover from when they were Ruggles Green, because there's a new Bella Green restaurant in that listing that was never, ever a Ruggles Green. They had already changed the names to Bella Green and were operating as a Bella Green. That is the Bella Green Vintage Parkway, I believe it's called, restaurant. That was opened later, and it's on the Visit Houston website. So clearly they've had some activity there since their time when they were using the Ruggles Green mark. Also, the other, as you can see, in entering into the settlement agreement, Bruce Molzan really relied on the representations there. He really just wanted them to leave Ruggles Green alone and not refer to him and not refer to Ruggles Green. That hasn't happened. And you can see there are representations in there. They were going to do this and this and this and make sure of this and this. And I really wanted to, after I finally realized from this, you can hear the way they present themselves today, and I realized that in doing this lawsuit that I thought, okay, I think one of the problems is that there was fraudulent inducement entering into the settlement agreement in the first place. I don't think they really did try. And so to help with Google, because I myself did contact Google several times, and I'd say, you know, certain complaints about this, and they would take things down. And then the next day or two later, they'd pop back up the same again. And I thought, how does that happen? And I don't know, because they say on Google, if you have a problem, you know, do this and tell them and they'll take care of it. And sure enough, it seemed to work. But then it comes back. And I don't know why it comes back. And so I'm not sure that the very masterful search engine optimizers are in play there. I just don't. That's one reason I included them in the lawsuit. And I think they've had plenty of activity in Texas and they should be in the lawsuit. I guess I'm supposed to tell you what I want from this. And I would really like to see reversed in the district court. And we might leave to amend the complaint to include a fraudulent inducement in the settlement agreement, because I think that's really what has happened. And I don't know if you can do this, but in any case, if you could put something in the opinion that you've noticed that there really is confusion and conflation by Google and some of the search engines for Ruggles Green and Bella Green, just say you've observed that so I can take that to Google and try to get their attention so they can correct this problem, because I've been working on it for several years and I can't get it corrected. Thank you very much. All right, counsel. Interesting case. Appreciate your assistance in bringing it to us. That is the end of oral arguments for today and for the week. We are adjourned.